

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-22-00142-CV

———————————————————

SHERI HILL, Appellant

V.

FITNESS INTERNATIONAL, LLC D/B/A L.A. FITNESS, Appellee

On Appeal from the 442nd District Court
Denton County, Texas
Trial Court No. 21-2378-442

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

This is a slip-and-fall case in which Appellant Sheri Hill sued Appellee Fitness International, LLC d/b/a L.A. Fitness for premises liability, negligence, and gross negligence. L.A. Fitness moved for a combined traditional summary judgment on its affirmative defense of release,[1] *see* Tex. R. Civ. P. 94, and a no-evidence summary judgment on premises liability. The trial court granted L.A. Fitness's motion. In a single issue containing multiple arguments, Hill complains that the trial court erred by granting L.A. Fitness's motion and by sustaining L.A. Fitness's objections to some of her summary-judgment evidence.

Because Hill signed a release that waived her premises-liability claim,[2] the trial court did not err by granting summary judgment on it. However, because Hill's

---

[1]A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all elements of that defense. *See Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010); *see also* Tex. R. Civ. P. 166a(b), (c).

[2]As pointed out by L.A. Fitness, Hill's negligence claim was subsumed by her premises-liability claim. *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2010) ("We have recognized that negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury, while premises liability encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe." (footnotes omitted)); *see also United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471 (Tex. 2017) (distinguishing contemporaneous negligent activity on the property—ordinary negligence—from premises liability); *DeLamar v. Fort Worth Mountain Biker's Ass'n*, No. 02-17-00404-CV, 2019 WL 311517, at *4 (Tex. App.—Fort Worth Jan. 24, 2019, pet. denied) (mem. op.) ("While, theoretically, a litigant may maintain causes of action for both general negligence and premises liability, to be viable, the general negligence theory of recovery

remaining summary-judgment evidence was sufficient to raise a fact issue on all of L.A. Fitness's no-evidence grounds and because L.A. Fitness did not move for summary judgment on—or amend its summary-judgment motion to address—the remaining elements of Hill's gross-negligence claim,[3] we join the majority of our sister courts that have addressed the issue of whether a gross-negligence claim can survive a negligence claim's release to hold that on this record, Hill's claim has done so. Accordingly, we reverse the portion of the trial court's judgment granting summary judgment on Hill's gross-negligence claim and remand the case for further proceedings on that claim.

## II. Background

In May 2011, Hill completed an L.A. Fitness membership application (the contract). The first page of the three-page contract states—in bold, in a larger font than the surrounding text, and immediately above where Hill signed—

NOTICE TO PURCHASER: Do not sign this contract until you read it or if it contains blank spaces. This Agreement contains a full and complete release of claims on page 2.
If you decide you do not wish to remain a member of this health spa, you may cancel this contract by mailing to the health spa by midnight of the third business day after the day you sign this contract a notice stating your desire to cancel this contract. The written notice must be mailed by certified mail to the following address: P.O. Box 54170, Irvine, CA 92619-4170 or delivered to the L.A. Fitness facility. For a speedy refund, visit the nearest L.A. Fitness location; be sure to get a receipt.

---

must be based not upon an injury resulting from the condition of the property, but upon the defendant's contemporaneous activity."); *Mangham v. YMCA of Austin, Tex.-Hays Cmtys.*, 408 S.W.3d 923, 929 (Tex. App.—Austin 2013, no pet.) (same).

[3]Hill added her gross-negligence claim on the same day that she filed her summary-judgment response.

3

The contract's second page contains a boxed provision that provided (as noted on the first page) a comprehensive release and waiver of liability and indemnity, stating,

> **IMPORTANT: RELEASE AND WAIVER OF LIABILITY AND INDEMNITY.** You hereby acknowledge and agree that use by Member and/or by Member's minor children of L.A. Fitness' facilities, services, equipment or premises, involves risks of injury to persons and property, including those described below, and Member assumes full responsibility for such risks. In consideration of Member and Member's minor children being permitted to enter any facility of L.A. Fitness (a "Club") for any purpose including, but not limited to, observation, use of facilities, services or equipment, or participation in any way, Member agrees to the following: Member hereby releases and holds L.A. Fitness, its directors, officers, employees, and agents harmless from all liability to Member, Member's children and Member's personal representatives, assigns, heirs, and next of kin for any loss or damage, and forever gives up any claim or demands therefore, on account of injury to Member's person or property, including injury leading to the death of Member, whether caused by the active or passive negligence of L.A. Fitness or otherwise, to the fullest extent permitted by law, while Member or Member's minor children are in, upon, or about L.A. Fitness premises or using any L.A. Fitness facilities, services or equipment. Member also hereby agrees to indemnify L.A. Fitness from any loss, liability, damage or cost L.A. Fitness may incur due to the presence of Member or Member's children in, upon or about the L.A. Fitness premises or in any way observing or using any facilities or equipment of L.A. Fitness whether caused by the negligence of Member(s) or otherwise. You represent (a) that Member and Member's minor children are in good physical condition and have no disability, illness, or other condition that could prevent Member(s) from exercising without injury or impairment of health, and (b) that Member has consulted a physician concerning an exercise program that will not risk injury to Member or impairment of Member's health. Such risk of injury includes (but is not limited to): injuries arising from use by Member or others of exercise equipment and machines; injuries arising from participation by Member or others in supervised or unsupervised activities or programs at a Club; injuries and medical disorders arising from exercising at a Club such as heart attacks, strokes, heat stress, sprains, broken bones, and torn muscles and ligaments, among others; and accidental injuries occurring anywhere in Club dressing rooms, showers and other facilities. Member further expressly agrees that the foregoing release, waiver and indemnity agreement is intended to be as broad and inclusive as is permitted by the law of the State of Texas and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full force and effect. Member has read this release and waiver of liability and indemnity clause, and agrees that no oral representations, statements or inducement apart from this Agreement have been made.

The boxed text was the same size as the surrounding text. Immediately below the boxed text was a statement in capital letters that "IN NO EVENT SHALL L.A. FITNESS BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES."

Eight years later, Hill slipped on water in the ladies' locker room, was injured when she fell, and sued L.A. Fitness to recover for her injuries. L.A. Fitness sought a traditional summary judgment on its affirmative defense of release, attaching a copy of the contract signed by Hill and her discovery response admitting that she had signed it, and a no-evidence summary judgment on four premises-liability elements. Hill responded to L.A. Fitness's motion by attaching her deposition transcript and deposition transcripts from a former L.A. Fitness water aerobics instructor and from a former L.A. Fitness member-service and operations manager. L.A. Fitness objected to

the former employees' deposition transcripts, which had been videotaped and transcribed, but not by a court reporter, and moved to strike them. The trial court sustained the objections, struck the former employees' transcripts, and granted L.A. Fitness's summary-judgment motion.

### III. Discussion

In a single, multi-pronged issue, Hill argues that L.A. Fitness's motion should have been denied because (1) the trial court abused its discretion by striking the former employees' deposition transcripts; (2) the release did not meet the "fair notice" standards requiring that it be conspicuous and expressly include negligence; (3) the release did not include her gross-negligence claim; and (4) even if the trial court properly struck the former employees' deposition transcripts, the remaining summary-judgment evidence raised a genuine issue of material fact regarding each of L.A. Fitness's no-evidence grounds.

### A. Summary-judgment evidence

If a trial court has properly sustained objections to summary-judgment evidence, we may not consider those parts of the record. *Hobson v. Francis*, No. 02-18-00180-CV, 2019 WL 2635562, at *6 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.). We review a trial court's decision to exclude summary-judgment evidence for an abuse of discretion. *Id.*

In the trial court, Hill used written transcriptions of the two former employees' videotaped depositions but did not use a certified court reporter to make the

5

transcriptions. *See* Tex. R. Civ. P. 203.6. L.A. Fitness objected that its former employees' deposition transcripts were "not certified or authenticated in any way, nor were they prepared by a licensed court reporter," that they contained unclear transcription errors, and that the lack of authentication rendered the exhibits "nothing more than unauthenticated hearsay." The trial court's order sustaining L.A. Fitness's objections does not state the basis for its order.

Because the trial court's order does not state upon which ground it sustained L.A. Fitness's objections, to avoid waiving this sub-issue, Hill was required to challenge each ground: (1) lack of certification; (2) lack of authentication; (3) lack of preparation by a licensed court reporter; (4) unclear transcription errors; and (5) hearsay. *See* Tex. R. App. P. 33.1; *Rex Performance Prods., LLC v. Bettegowda*, No. 02-18-00171-CV, 2019 WL 3955205, at *3 (Tex. App.—Fort Worth Aug. 22, 2019, no pet.) (mem. op.) ("When an appellee objects to evidence on several independent grounds and, on appeal, the appellant complains of the exclusion of the evidence on only one of those grounds, the appellant waives any error by failing to challenge all possible grounds for the trial court's ruling that sustained the objection."); *see also* 6 McDonald & Carlson Tex. Civ. Prac. App. Prac. § 38:4 (2d ed.) (defining scope of attack on trial court's ruling).

On appeal, Hill complains (1) that the trial court improperly struck the transcripts on the basis that a stenographic reporter had not been used to take the depositions, which she contends was an abuse of discretion under Rule of Civil Procedure 203.6(a); (2) that the trial court should have required "that the transcriptions be transcribed from

6

a certified court reporter rather than striking the exhibits for use as evidence" but never gave her the opportunity to obtain a transcript from a certified court reporter; (3) that L.A. Fitness was not surprised or prejudiced because it was represented by counsel at the depositions and able to question the witnesses; and (4) that if the trial court struck the exhibits as hearsay, it abused its discretion by doing so because the depositions were videotaped and taken under oath.[4] Hill does not challenge L.A. Fitness's objection that the deposition transcripts contained unclear transcription errors.[5] Accordingly, we

---

[4]In its response, L.A. Fitness argues that, among other things, Hill's failure to object to the trial court's ruling on L.A. Fitness's objections did not preserve error, referring us to *Montenegro v. Ocwen Loan Servicing, LLC*, 419 S.W.3d 561, 568–69 (Tex. App.—Amarillo 2013, pet. denied), and *Rollins v. Uribe*, No. 12-19-00262-CV, 2020 WL 1283904, at *2 (Tex. App.—Tyler Mar. 18, 2020, no pet.) (mem. op.), to support its waiver argument. Both of those cases rely on *Cantu v. Horany*, 195 S.W.3d 867, 871 (Tex. App.—Dallas 2006, no pet.), which this court has declined to follow on that basis. *Miller v. Great Lakes Mgmt. Serv., Inc.*, No. 02-16-00087-CV, 2017 WL 1018592, at *2 n.4 (Tex. App.—Fort Worth Mar. 16, 2017, no pet.) (mem. op.) ("We do not believe a party is required to object to the sustaining of an objection in order to complain of the sustaining of the objection on appeal; to the extent these decisions by our sister courts hold otherwise, we decline to follow them."); *see* Hon. David Hittner & Lynne Liberato, *Summary Judgments in Texas: State and Federal Practice*, 60 S. Tex. L. Rev. 1, 63 (2019) (noting split in authority and observing that "[t]he better reasoned approach should be that there is no requirement. Summary judgment practice tends to mirror trial court procedure and a lawyer need not object to a ruling sustaining an objection at trial to preserve error."); *see also Browder v. Moree*, 659 S.W.3d 421, 423 (Tex. 2022) (noting, in jury-trial-demand context, that "neither our procedural rules nor this Court's decisions require a party that has obtained an adverse ruling from the trial court to take the further step of objecting to that ruling to preserve it for appellate review").

[5]Instead, in her reply brief, Hill states that at the March 22, 2022 summary-judgment hearing, the trial court told her that it would give her time to receive a certification for the transcripts and that L.A. Fitness waived its objections by opting to proceed with arguments on the merits. In support of these assertions, Hill refers us to a hearing transcript that she attached as an appendix to her reply. We may not consider

7

overrule this sub-issue on the unchallenged ground. *See Rex Performance Prods., LLC*, 2019 WL 3955205, at *3; *Britton v. Tex. Dep't of Crim. Just.*, 95 S.W.3d 676, 681 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

## B. Release

A release is an agreement in which a party agrees that a duty or obligation owed by the other party is discharged immediately or on the occurrence of a condition; it extinguishes a cause of action and bars recovery on the released matter. *Flores v. Hansen*, No. 2-09-465-CV, 2010 WL 3618737, at *4 (Tex. App.—Fort Worth Sept. 16, 2010, no pet.) (mem. op.). It is subject to the normal rules of contract construction. *Id.* It does not have to anticipate and identify each potential cause of action relating to the release's subject matter, but to preclude a claim, it must "mention" it. *Id.*

Further, as we have recently reiterated,

A release—an agreement to relieve a party of liability for its own future negligence—is an extraordinary shifting of risk, and the law therefore applies the fair notice requirements of indemnity agreements to releases. *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993). Fair notice consists of two parts: (1) the express negligence doctrine, under which a party seeking a release from the consequences of that party's own negligence must express that intent in specific terms within the four corners of the contract, and (2) the conspicuous requirement, which mandates that something must appear on the face of the contract to attract the attention of a reasonable person looking at it. *Id.* The Supreme Court of Texas has adopted the Uniform Commercial Code's

---

documents that do not appear in the record. *Murphy v. Leveille*, No. 2-08-130-CV, 2009 WL 2619857, at *2 n.3 (Tex. App.—Fort Worth Aug. 26, 2009, no pet.) (per curiam) (mem. op.). This court must hear and determine a case based on the record as filed and may not consider documents attached as exhibits to briefs. *Id.* Accordingly, we will not review the attached document, and it plays no role in our analysis. *See id.*

definition of conspicuousness, which provides in part that "[a] term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." *Id.* at 511. Whether a contract meets the fair notice requirements is a question of law. *Id.* at 509.

*Coleman v. Otese Ltd.*, No. 02-19-00015-CV, 2020 WL 370577, at *4 (Tex. App.—Fort Worth Jan. 23, 2020, no pet.) (mem. op.); *see Dresser Indus.*, 853 S.W.2d at 509 ("[C]ompliance with both of the fair notice requirements is a question of law for the court."). The UCC provides that "conspicuous" terms include the following:

> (A) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
>
> (B) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

Tex. Bus. & Com. Code Ann. § 1.201(b)(10).

In *Dresser Industries*, before adopting the UCC's definition of conspicuousness, the supreme court recounted examples of when language had been sufficiently conspicuous to afford fair notice, such as

- a one-page contract with indemnity language not hidden under a separate heading or surrounded by unrelated terms, *Enserch Corp. v. Parker*, 794 S.W.2d 2, 9 (Tex. 1990); and

- a purchase order that referred specifically to the indemnity provision on the order's reverse side and that contained a notice printed in large, red type on the front of each page stating that the agreement included the terms on the order's reverse side, *Goodyear Tire & Rubber Co. v. Jefferson Constr. Co.*, 565 S.W.2d 916, 920 (Tex. 1978).

853 S.W.2d at 510. The court also recounted when language had not been sufficiently conspicuous, such as

- an indemnity provision hidden on the reverse side of a sales order under a paragraph entitled "Warranty" and surrounded by completely unrelated terms, *K & S Oil Well Serv., Inc. v. Cabot Corp.*, 491 S.W.2d 733, 737 (Tex. App.—Corpus Christi–Edinburg 1973, writ ref'd n.r.e.);

- an indemnity provision on the back side of a delivery order, *Rourke v. Garza*, 511 S.W.2d 331, 344 (Tex. App.—Houston [1st Dist.] 1974), *aff'd*, 530 S.W.2d 794 (Tex. 1975); and

- indemnity language in small, light type on the back of a rental form and surrounded by unrelated terms, *Safway Scaffold Co. v. Safway Steel Prods., Inc.*, 570 S.W.2d 225, 228 (Tex. App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.).

*Id.* The court held that the release provisions in *Dresser Industries* were not conspicuous when they were located on the back of a work order in a series of numbered paragraphs without headings or contrasting type and the paragraphs were not so short that every term must be considered conspicuous. *Id.* at 511.

Applying *Dresser Industries*, four years later, the court held that "a six-paragraph release printed in minuscule typeface on the front of a one-page 'Release and Entry Form' for motorcycle racing," which was practically illegible, was not sufficiently conspicuous even though the headings in the release were in different, larger formats than the release language and the release was the only substantive writing on the single-page form. *Littlefield v. Schaefer*, 955 S.W.2d 272, 273–75 (Tex. 1997) (noting that as a matter of law, an exculpatory clause will not be enforced when a party is not able to know what the contract terms are because they are unreadable); *cf. Akin v. Bally Total*

*Fitness Corp.*, No. 10-05-00280-CV, 2007 WL 475406, at *2 (Tex. App.—Waco Feb. 14, 2007, pet. denied) (mem. op.) (holding release was conspicuous when the clause appeared in bold type and in part in larger type, was the only paragraph enclosed by a box, and was expressly referenced by paragraph number just above the signature line).

We addressed the release question in *Coleman*, in which an injured race car driver sued the racetrack's owner, who moved for summary judgment on the affirmative defense of release, among other grounds. 2020 WL 370577, at *1. We partially reversed the summary judgment on the ground of release because the summary-judgment evidence did not establish as a matter of law that the driver had released his negligence claim. *Id.* Instead, the summary-judgment evidence raised a fact issue when it established that, before the race, the driver signed a "tech card" that did not contain language expressing an intent to relieve the racetrack of liability for its own negligence and did not otherwise incorporate a release. *Id.* at *5. Further, the racetrack's owner did not present any evidence of the identity of the person who signed a release form for the driver that day and did not establish as a matter of law that any of the driver's crew members had actual or apparent authority to do so. *Id.* at *7.

In contrast to *Dresser Industries*, *Coleman*, and other cases in which release language has been held inconspicuous or otherwise did not express an intent to relieve a defendant of liability, the first page of the contract here states in bold, in a font size larger than the surrounding text, and immediately above where Hill signed, that it "**contains a full and complete release of claims on page 2.**" On the contract's

11

second page, in a separate boxed provision and highlighted by the language "**IMPORTANT: RELEASE AND WAIVER OF LIABILITY AND INDEMNITY**," the contract sets out a comprehensive release, which is followed by related terms about damages in capital letters.  L.A. Fitness attached to its summary-judgment motion Hill's responses to its requests for admission in which she admitted that she had signed the contract.

Further, regarding the express-negligence doctrine and the expression of intent in specific terms within the contract's four corners, *see Coleman*, 2020 WL 370577, at \*4, the release's terms expressly state that using the facility "involves risks of injury," that the member "assumes full responsibility for such risks," and that the member "forever gives up any claim or demands therefor[], on account of injury to [her] person . . . *whether caused by the active or passive negligence*[6] *of L.A. Fitness* or otherwise, to the fullest extent permitted by law, while Member . . . [is] in, upon, or about L.A. Fitness premises or using any L.A. Fitness facilities." [Emphasis added.]  It defines "risk of injury" to include "accidental injuries occurring anywhere in Club dressing rooms."

Because the contract provided fair notice of the release, which expressly addressed negligence claims, the trial court did not err by granting summary judgment to L.A. Fitness on Hill's premises-liability claim on this basis.  *See Grijalva v. Bally Total*

---

[6]"Active negligence involves affirmative action, positive activity, or the doing of something that should not have been done[,] whereas passive negligence is a failure to do something that should have been done."  53 Tex. Jur. 3d Negligence § 2 (footnotes omitted).

*Fitness Corp.*, No. 01-14-00217-CV, 2015 WL 1544582, at *5 (Tex. App.—Houston [1st Dist.] Apr. 2, 2015, no pet.) (mem. op.) (noting that membership agreement stated, approximately one inch above plaintiff's signature, in capital letters and bold typeface, that the agreement contained a waiver and release provision that applied to the plaintiff). We overrule this portion of Hill's sole issue.

## C. Gross negligence

Hill asserts that the release did not release her gross-negligence claim, arguing that "[o]rdinary negligence is not of the same ilk as gross negligence," and that she presented sufficient evidence to defeat L.A. Fitness's no-evidence motion on her premises-liability claim. L.A. Fitness acknowledges that the release does not preclude Hill's gross-negligence claim but asserts that the trial court correctly dismissed the gross-negligence claim because "[w]hen there is no evidence of ordinary negligence, there can be no gross negligence" and that the common elements of the premises-liability and gross-negligence claims allowed its motion to defeat both; it directs us to its no-evidence grounds on Hill's premises-liability claim.

### 1. Relationship between premises liability and gross negligence

Although premises liability is itself a branch of negligence law, it is a "special form" with different elements that define a property owner's duty with respect to those who enter the property. *Occidental Chem. Corp. v. Jenkins*, 478 S.W.3d 640, 644 (Tex. 2016) (noting that depending on the circumstances, a person injured on another's property may have either a negligence claim or a premises-liability claim). Generally,

13

premises owners have a duty to protect invitees[7] from, or warn them of, conditions posing unreasonable risks of harm if the owners knew of the conditions or, in the exercise of reasonable care, should have known of them. *Henkel v. Norman*, 441 S.W.3d 249, 251 (Tex. 2014).

To prevail on a premises-liability claim against a property owner, an injured invitee must establish four elements: (1) the property owner had actual or constructive knowledge of the condition causing the injury; (2) the condition posed an unreasonable risk of harm; (3) the property owner failed to take reasonable care to reduce or eliminate the risk; and (4) the property owner's failure to use reasonable care to reduce or eliminate the risk proximately caused the invitee's injuries. *Id.* at 251–52. An owner's premises-liability duties, like its negligence duties, are limited to a duty to exercise ordinary, reasonable care. *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 203 (Tex. 2015); *see JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021) ("When analyzing a negligence claim, we first ask whether the defendant owed the plaintiff a duty.").

The existence of a duty of care is also an element of a gross-negligence claim. *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 298 (Tex. 2020) (citing *Ford Motor Co. v. Miles*, 967 S.W.2d 377, 390 (Tex. 1998) (Gonzalez, J., concurring), for the proposition

---

[7]The parties do not dispute that Hill was an invitee at the time of the accident or that L.A. Fitness was the property's owner. *See Pena v. Harp Holdings, LLC*, No. 07-20-00131-CV, 2021 WL 4207000, at *4, *9 (Tex. App.—Amarillo Sept. 16, 2021, no pet.) (mem. op.) ("A premises liability claim is, therefore, a special form of negligence claim in which the duty owed to the injured party depends on that party's status on the premises at the time of the incident.").

that negligence and gross negligence are not separable causes of action but are inextricably intertwined); *Aikens v. Dueling*, No. 02-21-00320-CV, 2022 WL 3651976, at *6 (Tex. App.—Fort Worth Aug. 25, 2022, no pet.) (mem. op.) ("[W]ithout evidence of negligence, there can be no gross negligence to support exemplary damages.").

Gross negligence presumes a negligent act or omission, *see Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994) (op. on reh'g),[8] and includes two additional components: (1) viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of the risk involved but nevertheless proceed in conscious indifference to others' rights, safety, or welfare, *La.-Pac. Corp. v. Andrade*, 19 S.W.3d 245, 246 (Tex. 1999). "[W]hat separates ordinary negligence from gross negligence is the defendant's state of mind; in other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care." *Id.* at 246–47; *see Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993) (observing that what lifts ordinary negligence into gross negligence is the defendant's mental attitude such

---

[8]In *Moriel*, the court noted that in every negligence or gross-negligence case, some injury has allegedly occurred but the injury's magnitude may be entirely disproportionate to the riskiness of the behavior that caused it. 879 S.W.2d at 23. By way of example, the court cited "inadvertently dropping a wooden board into the metal hold of a ship[, which] may constitute negligence, but cannot be *gross* negligence. This is so even though the board, upon landing, triggers a . . . chain reaction, eventually causing the whole ship to explode." *Id.*

that gross negligence can never be the result of momentary thoughtlessness, inadvertence, or error of judgment).

The supreme court has "indicated that pre-injury waivers of future liability for gross negligence are void as against public policy." *Zachry Constr. Corp. v. Port of Hous. Auth. of Harris Cnty.*, 449 S.W.3d 98, 116 (Tex. 2014); *see Mem'l Med. Ctr. of E. Tex. v. Keszler*, 943 S.W.2d 433, 435 (Tex. 1997) (acknowledging holding in *Smith v. Golden Triangle Raceway*, 708 S.W.2d 574 (Tex. App.—Beaumont 1986, no writ), that a release of gross negligence is against public policy but narrowing *Smith* with regard to post-injury releases of gross-negligence claims); *see also McCloskey v. Clubs of Cordillera Ranch, LP*, No. 04-17-00234-CV, 2017 WL 6502444, at *3 (Tex. App.—San Antonio Dec. 20, 2017, no pet.) (mem. op.) (citing *Zachry Constr. Corp.* for the proposition that a pre-injury release of future liability for gross negligence is void against public policy); *Tex. Moto-Plex, Inc. v. Phelps*, No. 11-03-00336-CV, 2006 WL 246520, at *2 (Tex. App.—Eastland Feb. 2, 2006, no pet.) (mem. op.) ("Pre-accident releases of gross negligence violate Texas public policy."). Accordingly, the release did not operate to negate Hill's gross-negligence claim. We must next address whether a gross-negligence claim can survive the release of a negligence claim.

## 2. Split in authority

There is currently a split in authority regarding whether the absence of a viable negligence claim because of a release defeats a gross-negligence claim.[9] The First and Fourth Courts of Appeals have held that the absence of a viable negligence claim removes any justification for imposing actual damages, defeating the gross-negligence claim. *See Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 126–27 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *Newman v. Tropical Visions, Inc.*, 891 S.W.2d 713, 722 (Tex. App.—San Antonio 1994, writ denied); *cf. McCloskey*, 2017 WL 6502444, at *4 (concluding no error in granting no-evidence motion for summary judgment filed on gross-negligence claim when appellant provided no evidence that any of the appellees had an actual, subjective awareness of the risk and proceeded with conscious indifference).

The Fifth, Ninth, Tenth, and Fourteenth Courts of Appeals have held otherwise. *See Van Voris v. Team Chop Shop, LLC*, 402 S.W.3d 915, 926 (Tex. App.—Dallas 2013, no pet.); *Akin*, 2007 WL 475406, at *3; *Rosen v. Nat'l Hot Rod Ass'n*, No. 14-94-00775-CV, 1995 WL 755712, at *7 n.1 (Tex. App.—Houston [14th Dist.] Dec. 21, 1995, writ denied) (not designated for publication); *Smith*, 708 S.W.2d at 574–76.[10] We begin our chronological review with *Smith*, in which the issue was first addressed.

---

[9]Hill's brief discusses a number of these cases. L.A. Fitness's brief does not.

[10]The Thirteenth Court of Appeals has avoided addressing the issue. *See Benavidez v. Univ. of Tex.-Pan Am.*, No. 13-13-00006-CV, 2014 WL 5500469, at *6 (Tex. App.—

17

### a. *Smith v. Golden Triangle Raceway* **(Ninth Court, 1986)**

The plaintiff in *Smith* was injured in the "pit area" of a raceway and sued for negligence and gross negligence. 708 S.W.2d at 574. The raceway moved for and received summary judgment on the basis of the release the plaintiff had signed. *Id.* The court held that the release was valid as to the plaintiff's negligence claim but—looking to cases from South Dakota, Ohio, Maryland, Colorado, and the Fifth and Eleventh Circuits, as well as the Restatement of Contracts because there were no Texas cases on point—it held that "a term in a release attempting to exempt one from liability or damages occasioned by gross negligence is against public policy." *Id.* at 576.[11] It therefore remanded the case to trial "only on the issue of gross negligence and the actual and punitive damages attributable to such gross negligence, if any." *Id.*

### b. *Newman v. Tropical Visions, Inc.* **(Fourth Court, 1994)**

In *Newman*, the plaintiffs sued for negligence, gross negligence, and DTPA violations resulting from the deceased's participation in the defendants' scuba

---

Corpus Christi–Edinburg Oct. 30, 2014, no pet.) (mem. op.) (declining to address unraised issue after noting that it had "never addressed the issue of whether a release from liability for gross negligence is separable from a release of liability from negligence, or whether a release of liability for gross negligence violates public policy").

[11]In *Keszler*, the supreme court narrowed *Smith*'s broad holding that a release of gross negligence is against public policy by noting that the Ninth Court had failed to distinguish a pre-accident waiver of liability from a post-injury release made in settlement of claims. 943 S.W.2d at 435 ("We have never held post-injury releases of gross[-]negligence claims invalid. There is no logic in prohibiting people from settling existing claims.").

certification course in which the deceased had signed a pre-injury liability release. 891 S.W.2d at 715–16. The defendants moved for and received summary judgment based on the defenses of release and "consent/express assumption of the risk." *Id.* at 716–17. The deceased had agreed, under the release, to relieve the defendants from "all liability . . . caused by negligence." *Id.* at 719.

### (1) Majority opinion

The court's majority opinion attempted to distinguish *Smith* based on the subsequent 1987 "tort reform" legislation, which modified the common-law definition of gross negligence. *Id.* at 720–21. Although the court noted that gross negligence "may be tried and determined separately from negligence, as in actions brought under the worker's compensation statute for exemplary damages" and "may be a separable issue [that] can be determined upon a limited remand of a proceeding," it stated that there still must be a basis for actual damages (negligence) in order to recover for exemplary damages (gross negligence). *Id.* at 721–22 ("The difference between the two forms of negligence is one of degree rather than kind[;] . . . [w]hat lifts ordinary negligence into gross negligence is the defendant's mental attitude.").

Because the deceased had waived the defendants' liability for negligence in the release, "the absence of a viable negligence claim removes any justification for imposing actual damages" and "at least in the context of this case—negligence and gross negligence are not separable." *Id.* at 722. The court expressly noted though that its holding was limited by the plaintiffs' failure to raise issues such as fraud, ambiguity,

19

mistake, and the "express negligence" rule in their summary-judgment response and that it therefore did not address—and expressed no opinion on—"whether a pre-injury release which exempts one from the consequences of his gross negligence violates public policy." *Id.*

### (2) Concurring and dissenting opinion

Chief Justice Chapa dissented to the portion of the majority's holding that the release waived the defendants' liability for gross negligence and would have held that under existing Texas case law, and as a matter of public policy, gross negligence cannot be waived. *Id.* at 723 (Chapa, C.J., concurring in part and dissenting in part). The chief justice noted that at that time, *Smith* was the only case in Texas that had addressed the issue of whether an express release could relieve a defendant from liability for damages occasioned by its own gross negligence and had "unequivocally held that such a release is void as against public policy." *Id.*

The chief justice further noted that nothing precluded an award of actual damages for gross negligence, that a jury finding of actual damages resulting from a grossly negligent act would serve as the predicate for possible exemplary damages in conformance with Civil Practice and Remedies Code Section 41.004, and that actual damages need only exist but do not necessarily have to be recoverable, noting that "[t]he most visible instance in which a plaintiff is barred from recovering actual damages for negligence but can nevertheless recover exemplary damages is a survivor's claim for wrongful death due to the gross negligence of the deceased's employer" under the

20

worker's compensation statute. *Id.* at 724–25. The chief justice observed that the situation was analogous, stating,

> *But for* the release [that] waived ordinary negligence, Appellants would be *entitled* to recover damages based on that negligence. The fact that they are barred by the signed waiver from pursuing a claim for monetary damages based on ordinary negligence should not bar them from pursuing their claim for damages based on gross negligence.

*Id.* at 725. Regarding the public policy at issue, Chief Justice Chapa noted, "[A] provider of services to the public should not be able to cause the death of a patron by an act or omission committed with a conscious indifference to that patron's safety with absolute impunity." *Id.* at 725–26.

### c. *Rosen v. National Hot Rod Association* (Fourteenth Court, 1995)

In *Rosen*, the plaintiff sued the raceway and racing association after his vehicle overturned in an amateur drag race and was consumed by flames. 1995 WL 755712, at *1. He alleged, among other things, negligence and gross negligence in the post-crash rescue operations. *Id.* The defendants moved for and received summary judgment based on the plaintiff's having executed a release and indemnity agreement. *Id.* The court first noted that a release cannot absolve an individual from his liability for gross negligence, citing *Golden Triangle Raceway*, before observing that the plaintiff did not explain how his summary-judgment proof raised a fact question as to gross negligence and that nothing in the record contained allegations of the kind of egregious conduct required to support a gross-negligence claim. *Id.* at *7. In a footnote, the court found

21

"Chief Justice Chapa's dissenting opinion [in *Newman*] to be well reasoned" and declined to follow the *Newman* majority. *Id.* at *7 n.1.[12]

The court later revisited the question in a plurality opinion within the context of a utility company's tariff. *Del Carmen Canas v. Centerpoint Energy Res. Corp.*, 418 S.W.3d 312, 315–16 (Tex. App.—Houston [14th Dist.] 2013, no pet.). The decedent's children sued a natural gas provider for negligence and gross negligence, among other claims, after her apartment filled with gas and exploded, burning and ultimately killing her. *Id.* at 316–17. Each of the three panel members (Chief Justice Frost and Justices Christopher and Jamison) wrote an opinion. *Id.* at 315–16. The court issued a plurality opinion on the negligence claims, on which it affirmed the trial court's judgment; it reversed the trial court's judgment on the gross-negligence claim based on "section C. of Justice Christopher's [concurring and dissenting] opinion, which [formed] a majority opinion of the court as to the gross-negligence claim." *Id.* at 316.

The utility argued, among other things, that a gross-negligence claim did not exist independently of an underlying negligence claim. *Id.* at 324. In dissent, Chief Justice Frost, who otherwise wrote the majority opinion, agreed with Justice Christopher that

---

[12]The court also noted that it had previously held that negligence and gross negligence constituted two separable causes of action. *Rosen*, 1995 WL 755712, at *7 n.1. *But cf. Nowzaradan v. Ryans*, 347 S.W.3d 734, 739 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (noting that "excepting certain worker's compensation cases, it is well established that a finding of ordinary negligence is prerequisite to a finding of gross negligence" and holding that negligence and gross negligence are not separable causes of action but are inextricably intertwined).

the tariff's limitation-of-liability bar did not compel the conclusion that gross-negligence claims are also barred on the theory that they do not exist independently of an underlying negligence claim, although the chief justice noted that in other contexts, the absence of a common-law negligence duty or the plaintiff's failure to prove a negligence claim might preclude recovery under a gross-negligence claim. *Id.* at 326.

Section C. of Justice Christopher's concurring and dissenting opinion, which Justice Jamison joined, noted that the utility did not prove that it was not negligent but rather that its tariff relieved it of liability for any such negligence. *Id.* at 329, 336. Justice Christopher stated, "In this respect, I agree with Chief Justice Frost: when liability for negligence is barred by a limitation of liability in a utility's tariff, that bar does not automatically defeat a claim for gross negligence." *Id.* at 329. Justice Christopher observed that the tariff acted as a pre-injury release. *Id.* at 331 & n.1. (citing *Rosen* and noting "this court has repeatedly reached the same result" in expressly rejecting the *Newman* majority opinion).

### d. *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.* (First Court, 2002)

*Tesoro* involved an indemnity agreement entered into between an oil well operator and a driller in which gross negligence and willful misconduct were specifically excluded. 106 S.W.3d at 121–22. The oil well subsequently blew out, caught fire, destroyed a drilling rig, and rendered the well unworkable. *Id.* at 123. The working-interest owner sued the driller, who sought indemnity from the operator. *Id.* The owner

23

then settled without an admission of liability by anyone. *Id.* at 123. The trial court granted summary judgment to the driller, and the operator appealed, arguing that to defeat the driller's indemnity argument, it needed only to show that the owner's pleadings asserted that the driller's gross negligence and willful misconduct had caused his losses. *Id.* at 124–25. The court noted that facts, not allegations, determine a duty to indemnify and that there was no determination of liability when the owner settled. *Id.* at 125–26. Further, to support its affirmative defense of contract exclusion, the operator bore the burden to raise a fact issue on each and every element of the driller's alleged gross negligence or willful misconduct so as to bring the indemnity claim within the indemnity agreement's exclusions but had failed to show a genuine issue of material fact on causation. *Id.* at 126.

The court then turned to whether compensatory damages could be awarded for gross negligence and willful misconduct. *Id.* The court noted, "Negligence and gross negligence are not separable causes of action[] but are inextricably intertwined. Negligence is a liability finding[] involving duty, breach, and causation. Gross negligence presumes a negligent act or omission and includes two further elements"— the objective extreme degree of risk and the subjective awareness of the risk with conscious indifference. *Id.* The court concluded, "We agree with the San Antonio Court of Appeals, which has held that 'the absence of a viable negligence claim removes any justification for imposing actual damages" and that, in the context of a release for acts of negligence, negligence and gross negligence are not separable. *Id.* at 127 (citing

24

*Newman*, 891 S.W.2d at 722). The court affirmed the summary judgment requiring the operator to indemnify the driller. *Id.* at 135.

### e. *Akin v. Bally Total Fitness Corp.* **(Tenth Court, 2007)**

In *Akin*, after the plaintiff's father drowned in Bally's swimming pool, the plaintiff sued for negligence, gross negligence, and premises liability, among other claims. 2007 WL 475406, at *1. Bally moved for and received summary judgment on the ground of release. *Id.* at *1–2. The court affirmed the summary judgment on the negligence claims but not on the gross-negligence claim. *Id.* at *2. Bally had claimed that the release barred the plaintiff's claim for gross negligence as well as for negligence, but it did not negate any element of negligence or gross negligence, and "[t]he negligence release does not prevent proof of gross negligence." *Id.* at *3 (citing *Newman*, 891 S.W.3d at 723 (Chapa, C.J., concurring in part & dissenting in part)). In a footnote, the court observed, "We do not believe that the First Court of Appeals [in *Tesoro*] appreciated the limitations on the San Antonio Court's holding [in *Newman*].") *Id.* at *3 n.1.

The court was careful to note, however, that its "very narrow holding" was that the release in the case did not release a claim for gross negligence. *Id.* at *3 n.2. It cautioned,

> We do not express any opinion as to whether, in the context of this appeal of a summary judgment, Akin properly pleaded gross negligence. Nor, because this is not an appeal of a no-evidence motion for summary judgment, do we express any opinion as to whether the record contains any evidence of any of the elements of negligence (other than duty), or of

25

gross negligence's elements of extreme risk or actual awareness. We hold only that on this record from a traditional motion for summary judgment, Bally did not affirmatively attempt to negate the elements of gross negligence and did not conclusively prove all the elements of a defense to gross negligence.

*Id.*

### f. *Van Voris v. Team Chop Shop, LLC* (Fifth Court, 2013)

In *Van Voris*, the plaintiff sued the defendant for negligence and gross negligence after he was injured in the defendant's aikido course. 402 S.W.3d at 917. The defendant moved for and received summary judgment based on its affirmative defense of the pre-injury release signed by the plaintiff. *Id.* The court held that the release defeated the plaintiff's negligence claim. *Id.* at 919–21. It then noted that the supreme court had not yet addressed whether a gross-negligence claim could survive a negligence claim's defeat by the pre-injury release and that "courts of appeals have reached different conclusions." *Id.* at 921. The court concluded that the gross-negligence claim survived summary judgment based on "the strong public policy against pre-injury releases of liability for one's own negligence, the Texas Supreme Court's acknowledgement that proof of actual damages and entitlement to those damages may be distinct issues in some circumstances, the heightened requirements for proving gross negligence," and the application of these concepts to the case's facts, including that the release did not refer to gross negligence. *Id.* at 921–22, 924.

The court noted that neither the *Newman* court nor the *Tesoro* court had directly addressed the relationship between the public policy issues surrounding a pre-injury

release of claims for gross negligence and the legal principles espoused by the courts regarding the inseparability of ordinary and gross-negligence claims. *Id.* at 924–25 (citing *Nabours v. Longview Sav. & Loan Ass'n*, 700 S.W.2d 901, 903 (Tex. 1985), for the proposition that a finding on the existence and amount of actual damages is required to support a punitive damages award, even if those actual damages are not recoverable).

The court also noted that while the release signed by the plaintiff effectively released pre-injury claims based on negligence, it did not mention gross negligence or suggest that the plaintiff "was releasing a right to prove the elements of a negligence claim or actual damages, which would be a prerequisite to recovery of exemplary damages." *Id.* at 925. It observed that the distinction between recovery and proof is significant when considered in the context of negligence and gross-negligence claims. *Id.* And it held that while there "certainly are circumstances when negligence and gross[-]negligence claims cannot be separated legally[,] [t]hose circumstances are not presented in the context of a pre-injury, general negligence release." *Id.* at 926.

The court concluded that the plaintiff had not relinquished his gross-negligence claim based on the pre-injury release and that the release did not preclude proof of claims for negligence and actual damages (necessary for the gross-negligence claim), so it reversed the summary judgment on the gross-negligence claim and remanded that portion of the case for further proceedings. *Id.* However, it limited its conclusion "to the context presented by this case." *Id.*; *cf. Quiroz v. Jumpstreet8, Inc.*, No. 05-17-00948-CV, 2018 WL 3342695, at \*4–5 (Tex. App.—Dallas July 9, 2018, pet. denied) (mem.

27

op.) (distinguishing *Van Voris*, upholding summary judgment when release expressly listed "gross[-]negligence claims," and noting that the supreme court has not yet ruled on whether a pre-injury release of gross negligence is against public policy "when there is no assertion that intentional, deliberate, or reckless acts cause[d] injury").

### 3. Application

Based on our review of the relevant authorities cited above, we conclude that there is indeed a distinction between lacking any evidence to support a viable negligence claim, which would defeat a gross-negligence claim, and a viable negligence claim that is subject to a release when a related gross-negligence claim is not subject to that release. *See Van Voris*, 402 S.W.3d at 925. That is, if there is sufficient evidence to support a jury's identification of an actual damages award for negligence—even if those damages would not be *recoverable* because of a release—then the gross-negligence claim should not automatically disappear in the negligence claim's defeat by release on summary judgment. *See* Ryan S. Holcomb, Comment, *The Validity and Effectiveness of Pre-Injury Releases of Gross Negligence in Texas*, 50 Baylor L. Rev. 233, 249 (1998) ("[T]he same logic and analysis that allows an employee to step outside the Workers' Compensation Act and recover damages based on the employer's gross negligence should be applied to allow a party who has released its negligence cause of action in a pre-injury release to recover damages based on gross negligence."). If there is not sufficient evidence to support a viable negligence claim, then there will not be sufficient evidence to support a gross-negligence claim. *See Reyna v. Acad. Ltd.*, No. 01-15-00988-CV, 2017 WL

28

3483217, at *8 (Tex. App.—Houston [1st Dist.] Aug. 15, 2017, no pet.) (mem. op.) (noting that when appellants failed to establish breach of a legal duty, there was no need to reach their gross-negligence assertions).

Further, because nothing in the release here prevents proof of gross negligence, *see Akin*, 2007 WL 475406, at *3, if Hill brought forth sufficient summary-judgment evidence to defeat L.A. Fitness's no-evidence grounds, then because L.A. Fitness did not amend its summary-judgment motion to add gross negligence's additional elements, we must sustain this portion of Hill's sub-issue. Accordingly, we turn to the no-evidence summary-judgment standard of review, L.A. Fitness's no-evidence grounds, and Hill's remaining summary-judgment evidence.

### 4. No-evidence summary judgment

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus. Inc v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009) (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than

a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

### a. No-evidence grounds

L.A. Fitness asserted that Hill (1) had no evidence of actual or constructive knowledge of a condition on the premises that posed an unreasonable risk of harm, including no evidence that it had created the condition, which would show actual knowledge, and no evidence that it was or should have been aware of the condition before Hill's accident; (2) had no evidence of an unreasonable risk of harm; (3) had no evidence that L.A. Fitness failed to exercise reasonable care to reduce or eliminate the risk; and (4) had no evidence of proximate cause.

### (1) Actual or constructive knowledge

Regarding actual or constructive knowledge, an invitee may raise a fact issue by presenting evidence establishing that (1) the defendant placed something on the floor; (2) the defendant actually knew that the material was on the floor; or (3) it is more likely than not that the condition existed long enough to give the premises owner a reasonable opportunity to discover it. *Harkins v. Wal-Mart Stores Tex., LLC*, No. 02-21-00201-CV, 2022 WL 3453548, at *5 (Tex. App.—Fort Worth Aug. 18, 2022, pet. filed) (mem. op. on reh'g) (citing *Wal-Mart Stores, Inc. v. Reece*, 81 S.W.3d 812, 814 (Tex. 2002)). The owner's creating a condition that posed an unreasonable risk of harm may support an inference of knowledge. *Id.*

Constructive knowledge has a temporal element. *Vernon v. Dallas/Fort Worth Int'l Airport Bd.*, No. 02-16-00488-CV, 2017 WL 2979828, at *2 (Tex. App.—Fort Worth July 13, 2017, no pet.) (mem. op.). When circumstantial evidence is relied upon to prove constructive notice, the evidence must establish that it is more likely than not that the dangerous condition existed long enough to give the proprietor a reasonable opportunity to discover it. *Wal-Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936–37 (Tex. 1998) ("Dirt in macaroni salad lying on a heavily[ ]traveled aisle is no evidence of the length of time the macaroni had been on the floor."); *see Reece*, 81 S.W.3d at 814 ("Because Reece presented no evidence that Wal-Mart placed the foreign substance on the floor or actually knew it was there, she had to prove that the spill had been on the floor for a sufficient period of time that Wal-Mart had a reasonable opportunity to discover it.").

### (2) Unreasonable risk

A dangerous condition that presents an unreasonable risk of harm is one that creates a substantial risk of injury when the property is used with due care in a manner in which it is reasonably foreseeable that it will be used. *Harkins*, 2022 WL 3453548, at *5. In assessing actual knowledge that a condition presents an unreasonable risk of harm, courts may consider whether the owner had received reports of the potential danger presented by the condition. *Id.* In determining whether a condition is unreasonably dangerous, courts have considered whether the relevant condition was clearly marked, its size, whether it had previously caused injuries or generated

31

complaints, whether it substantially differed from conditions in the same class of objects, and whether it was naturally occurring. *United Supermarkets, LLC v. McIntire*, 646 S.W.3d 800, 803 (Tex. 2022). Reasonable care regarding a wet floor may be adequately established by an employee's warning a customer to "watch the wet spot," or a wet floor warning sign and a verbal warning to be careful because the "floor may be a little damp." *Henkel*, 441 S.W.3d at 252. "Texas courts have consistently found that indoor wet floors can pose an unreasonably dangerous condition." *Wal-Mart Stores, Inc. v. Sparkman*, No. 02-13-00355-CV, 2014 WL 6997166, at *3 (Tex. App.—Fort Worth Dec. 11, 2014, pet. denied) (mem. op.); *cf. M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 672, 676 (Tex. 2004) (holding, as a matter of law, that ordinary mud accumulating naturally on a concrete slab outside of a business—without the assistance or involvement of unnatural contact—did not pose an unreasonable risk of harm).

### (3) Reasonable care

Other slip-and-fall cases have established that mats can prevent falls on wet tile. *See Biermeret v. Univ. of Tex. Sys.*, No. 2-06-240-CV, 2007 WL 2285482, at *6 (Tex. App.—Fort Worth Aug. 9, 2007, pet. denied) (mem. op.) ("Clearly, at UTA, as at Brookshire Grocery, more mats could have been used and warning signs posted.");[13] *see also*

---

[13]In *Biermeret*, the plaintiff paid to use the university's exercise facilities, and it was his normal routine to shower before swimming. 2007 WL 2285482, at *1. After taking his preswim shower, he exited the shower, walked across the shower area on some mats, stepped off of a mat onto an uncovered area of the tile floor, slipped, and fell on the tile floor. *Id.* Although he established through emails that the tile floor in the shower area routinely became wet and slick, that a prior facility user had slipped and fallen on

*Brookshire Grocery Co. v. Taylor*, 222 S.W.3d 406, 407 (Tex. 2006) (recounting that store employee testified that more mats could have been used and warning signs posted).[14]

### (4) Proximate cause

The proximate cause element of a premises-liability claim has two components: cause-in-fact and foreseeability. *Harkins*, 2022 WL 3453548, at *6 (citing *LMB, Ltd. v. Moreno*, 201 S.W.3d 686, 688 (Tex. 2006)). The test for cause-in-fact, or "but-for" causation is whether (1) the act or omission was a substantial factor in causing the injury and (2) without the act or omission the harm would not have occurred. *LMB, Ltd.*, 201 S.W.3d at 688. A premises-liability plaintiff facing a no-evidence summary-judgment motion on causation has the burden to produce summary-judgment evidence that her accident was a foreseeable result of the defendant's failure to use reasonable care to reduce or eliminate an unreasonably dangerous premises condition and that the

---

the wet tile, and that the wet, slick tile floor was a hazard to people using the shower, there was no evidence that the university possessed actual or constructive knowledge that the water was on the floor in the shower area when he slipped. *Id.* at *6.

[14]In *Brookshire*, a store patron slipped and fell on a piece of partially melted ice on a tile floor in front of a self-service drink dispenser. 222 S.W.3d at 407. An employee testified that ice fell from the dispenser on a daily basis, that it was a hazard to customers and had to be cleaned up regularly, that there were three mats around the front of the dispenser that did not completely cover the tile floor, and that the plaintiff had slipped where the floor was bare. *Id.* The employee further testified that more mats could have been used and warning signs posted. *Id.* The supreme court concluded that the only unreasonably dangerous condition in the case was the ice that was actually on the floor, that the store did not have actual knowledge of it, and that there was no evidence that the condition had lasted long enough—the ice not having fully melted—for the store to have constructive notice. *Id.* at 409.

defendant's failure was a substantial factor in causing her injuries. *See id.* Mere proof that the injuries occurred on the defendant's premises is not proof of such proximate cause. *Id.*

### b. Hill's deposition

Hill attached her deposition to her summary-judgment response. In her deposition, Hill testified that she had slipped and fallen on water on the floor in the women's locker room, resulting in a ruptured hamstring that prevented her from walking for six months after reattachment surgery. At the time of the incident, she had been going to L.A. Fitness two or three times a week to train for a planned hike in Colorado. She had not kept a rigid schedule but would usually go from midmorning to around noon or 1 p.m. Hill did not recall what time she had gone to L.A. Fitness on the morning of the incident.

After exercising that day, she had gone into the locker room area, walked past a row of sinks, went to pull the door open and her leg "kind of slipped out in front" of her. Hill stated,

> My hand was on the door. I took a step forward with my right leg, . . . probably six inches maybe[,] my foot slipped kind of in front of me.
>
> The door was still closed. . . . And I had to get on the ground, and I couldn't go any further. And when I sat down, there was water.
>
> . . . .
>
> And I don't know how long I sat there, but I eventually got off the wet puddle on the floor on the tile, and I made my way over to the

34

carpeted area because there's a strip of carpet just where . . . the lockers and the benches are.

Hill testified that the amount of water in front of the door had been "probably half to quarter of an inch, and it was probably the width of the door or, you know, covered significantly . . . [t]hey had to mop up after -- after I got . . . onto the bench, they sent someone in to mop."

Hill stated that she assumed the water had come from women in swimsuits from an aqua class that "meets regularly during that time" or from the shower area, stating, "So women get out of the shower. They get out of the pool, and they walk directly to the carpeted area to go to the locker." When confirming, however, that this was Hill's assumption that the water had come from the women in swimsuits, Hill replied, "[H]ow would I know?" She restated, "My assumption is that the women in swimsuits that had just gotten out of the pool and the shower walking to the locker, that they dripped water onto the floor."

When asked if she had seen water in that area before the day of her accident, Hill replied, "They mop a lot, clean up a lot that time of day, but, you know, it's a locker room. There's water on the floor sometimes. I mean I'm careful, but that day I did not see the water. [There] was not a sign." Hill said that she did not know how long the water had been there and that there was no mat down, although "at Highland Village in the same area, they have mats down." She stated that she was not aware of anyone at L.A. Fitness who knew about the water before her fall, but she also stated that L.A.

35

Fitness set the time for the popular aqua class and would know when it started and ended.

When Hill returned to L.A. Fitness to cancel her membership, she "went into the restroom to see if they put a mat down where [she] slipped, and they still hadn't."

L.A. Fitness's defense counsel asked Hill if there was anything else important about the incident, and Hill replied, "Yes. The janitor apologized to me after I slipped and fell as she's mopping. She said, 'I'm sorry you got hurt,'" and then she put a sign down warning that the floor was wet. Hill also stated that when she asked L.A. Fitness's front desk employee why there had been no mat, that person replied, "[T]hey told me it was a nonslip floor," and she retorted to the employee, "I proved that wrong." Hill opined that if there had been a mat down, she would not have fallen because she had been wearing good shoes and had been steady and strong.

During her counsel's questions, when asked how much water was on the floor, Hill replied, "I would say a few cups. It's hard to tell because the floor is a white floor. The lighting is not very good. I would say fourth of an inch to half an inch, probably the width of the door." She also said that the water had pooled because the tile was not flat and that there were women from the aqua class in the locker room who were still in their swimsuits in the process of changing and leaving. She stated that L.A. Fitness's building was large and that it had "very few people working." Although there was sometimes a janitor or locker room attendant in the locker room to mop, Hill

speculated that the janitor had to be somewhere else that day and "wasn't able to get to that area" until after Hill fell.

Hill said that the L.A. Fitness at Highland Village had mats "outside the door. They have all through the walkways. It's very well -- they have a lot of mats in that area, and I always wondered why we didn't have them." Hill said there were no mats in the area when she fell and "after [she] fell, they did not put a mat down." She described the Highland Village mats as having holes in them to create traction between customers' feet and the slippery floor, stating, "the water would have pooled in the holes and not on the floor."

### c. Analysis

The membership agreement shows that Hill executed it at the Denton L.A. Fitness location, and her deposition testimony reflects she fell at that location. Hill's testimony reflects that L.A. Fitness set the start and end times for the aqua class and that it usually had someone clean up "that time of day," creating a fact question as to whether L.A. Fitness had actual knowledge of when its patrons would be changing out of wet swimsuits in the dressing room (giving rise to the floor's slippery condition). *Cf. Vernon*, 2017 WL 2979828, at *3 (noting that airport board presented evidence that none of its employees were aware of the standing water in the bathroom before the plaintiff's injury despite inspection and cleaning every 30 minutes and that its evidence was buttressed by the plaintiff's testimony that no warning signs had been posted, that she did not see any airport employees or janitorial workers in the bathroom, and that

37

she did not know how the water got there); *Gillespie v. Kroger Tex., L.P.*, 415 S.W.3d 589, 593 (Tex. App.—Dallas 2013, pet. denied) (affirming no-evidence summary judgment on premises-liability claim when plaintiff failed to provide any evidence that Kroger had actual or constructive knowledge of restroom's condition at the time of her fall); *Biermeret*, 2007 WL 2285482, at *5–6 (holding that plaintiff failed to establish university's actual or constructive knowledge that floor had become wet and slick prior to his fall).

Hill also stated that the area was frequently mopped and cleaned up at "that time of day" but that L.A. Fitness was understaffed and that its front desk employee had thought the floor was "nonslip." Hill testified that a nearby L.A. Fitness (Highland Village) put down mats "in the same area," "outside the door," and "through the walkways"; that the Highland Village L.A. Fitness had "a lot of mats in that area"; and that she had "always wondered why [the Denton L.A. Fitness] didn't have them." When she returned to Denton L.A. Fitness after the accident to cancel her membership, she "went into the restroom to see if they put a mat down where [she] slipped, and they still hadn't."

Viewed in the light most favorable to Hill and based on her testimony, there is more than a scintilla of evidence that L.A. Fitness had actual or constructive knowledge (based on setting the aqua class schedule) that water pooled in the locker room area at that time of day; that failing to place mats or a "wet floor" sign in the area at that time posed an unreasonable risk that someone would slip when a nearby L.A. Fitness placed mats in the same area; that failing to have someone that day at that time to mop (when

38

the area was usually cleaned) demonstrated a lack of reasonable care to reduce or eliminate the risk, particularly when it failed to put a mat in that area even after Hill's fall; and that L.A. Fitness's failure to exercise reasonable care had proximately caused Hill's injuries when it is foreseeable that a wet floor—unmarked by any caution signs—could cause someone to slip and fall.

Because there is more than a scintilla of evidence that L.A. Fitness was negligent on the premises-liability theory—even if Hill could not prevail on that theory because of the release—the trial court erred by granting L.A. Fitness's no-evidence motion as to gross negligence when L.A. Fitness did not amend its motion to affirmatively attempt to negate gross negligence's additional elements or to conclusively prove all of the elements of a defense to gross negligence. *See O'Donnell*, 288 S.W.3d at 424; *see also Campbell v. Pompa*, 585 S.W.3d 561, 577 (Tex. App.—Fort Worth 2019, pet. denied) (explaining that gross negligence consists of both objective and subjective elements beyond regular negligence); *Akin*, 2007 WL 475406, at *3 n.2 (declining in traditional summary-judgment appeal to opine about whether the appellant properly pleaded gross negligence or whether the record contained any evidence of negligence or gross-negligence elements); *cf. McCloskey*, 2017 WL 6502444, at *4 (holding no-evidence summary judgment was appropriate when the appellees filed no-evidence summary-judgment motions on the appellant's gross-negligence claim and the appellant failed to provide any evidence of actual, subjective awareness of the risk or a decision to proceed with conscious indifference). Accordingly, the trial court erred by granting L.A.

Fitness's motion on Hill's gross-negligence claim, and we sustain this portion of Hill's sole issue.

## IV. Conclusion

Having overruled part of Hill's sole issue, we affirm the portion of the trial court's judgment granting summary judgment on her premises-liability claim (which subsumed her negligence claim). Having sustained part of Hill's sole issue, we reverse the portion of the trial court's judgment granting summary judgment on her gross-negligence claim and remand that portion of the case for further proceedings.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: March 23, 2023